Case number 16-1405, Advanced Life Systems, Inc. Petitioner v. National Labor Relations Board. Mr. Laughlin for petitioner, Mr. Tsai for respondent. Mr. Laughlin. Good morning. My name is Gary Laughlin. I appear on behalf of Advanced Life Systems, the petitioner. We are here on appealing the findings of the NLRB that Advanced Life Systems committed unfair labor practices. And I believe the record is complete. If I may, this starts with a real question of the NLRB has never adequately defined when wage increases are given on a regular and consistent and predictable basis. This circuit had the problem in the NLRB on two occasions. They were unable or unwilling to define what regular and predictable wage increases were, and the circuit finally threw up its judicial hands and said, we're not going to do it for you. You won't do it, so we're not going to enforce it. And what I think is important to look at is the NLRB found that the credited evidence shows that the respondent informed employees upon their hire to expect periodic wage increases once every six months. And in fact, a substantial majority of employees received wage increases of at least 25 cents an hour at least one time a year from August 2009 to January 2012. Regular and predictable, to me, is just that. You're going to get 25 cents an hour on your anniversary date. You're going to get 1% the first of the year where people can do that. Are you arguing about the 8A1 violation right now? Or which violation are you making this As to the wage increases, the wage increases, the threats to not give wage increases, which were not threats at all, which we'll deal with in a moment, and the 8A3s and the I believe 8A5s on the Christmas gifts. But if you look at the actual I'm sorry, but to focus just on the wages so we don't have an 8A5 issue We have an 8A3. 8A3. Could you adequately raise and brief the 8A3 argument? I believe that the only thing we didn't do is mention 8A3. It was fully argued. Because to have that, the board relied on the violation of 8A1s. We indicated in the brief that to have an 8A1, you have to have a hostile motive. And, or as the board calls it, a union animus. And what the board is supposed to I think that's for 8A1. I thought 8A1 just looked at how a reasonable employee could have interpreted your statements. But if you look at the American Shipbuilding case, and you look at the Brown Foods case, they both say to have an 8A1, you have to have a hostile motive in that situation. The Browns Food case involved a lockout, and the Supreme Court said no, there was no hostile motive shown, so therefore it was not an 8A1. And the Browns Fruit case had to do with temporary replacements to allow them to go on. And the Supreme Court in both of those cases indicated the hostile motive was necessary to have that. In this case, the problem is, this circuit has said that when there's contradictory evidence, the board has to take that into account and has to explain why it didn't do that. The uncontradicted evidence is that ALS did not oppose the union organizing drive. And the other contradictory evidence that the board did not bother to discuss was the fact that Mr. Woodcock at page 57 of the appendix said, during the organizing, we can work this out ourselves, but if this is the route you want to go, meaning unionization, then there's nothing I'm going to do to stop it. Those are not indications of a hostile intent toward the union. So we go back to the board never understanding of being able to articulate what is an actual regular and predictable. And we look at the wages and the testimony. It's not supported because, despite what the board found, the testimony of one employee was that about every six months, even $0.25 or $0.50, depending upon performance, larger raises every one to two years. If you look at the chart, if you look at appendix 76, it doesn't happen. You look at the chart of the descent of the NLRB, there's no regular and predictable. The other employee said that you start as an EMT, get a wage increase when they got the paramedic certification, and you get periodic increases thereafter. That doesn't support the finding. The other one says you receive annual pay increases on the anniversary date, which was not consistent. But if you look at the Joint Exhibit 1 and you look at the chart of the descent of the NLRB, it certainly shows there was none. So how do you determine that? And the idea of a hostile intent, what if Mr. Woodcock, who made those statements, was uncertain or confused as to what the law requires? Because I don't think anybody's certain what the NLRB requires. If they're going to use this as being a regular and predictable increase, then anything is in requiring them to do that. I think the board would say its concern was that you were talking about we're not going to do raises because of the union or because of the union thing. Or if the union comes in and we won't be able to keep doing this. Now, why isn't that sufficient just for 8A1, even if you didn't have a consistent practice? Because the question is you have to look at the entire statements Mr. Woodcock was saying. Well, we only have to look at the ones that the ALJ and the board credited. We have to take the facts as found by the ALJ, which the board adopted. They did that. But they did not look at and explain the contradictory evidence to that. They just simply said we accept that credibility. And you have to look at the specific language used. I believe the specific language was if the union comes in, I'm not able to give that. Or we're not permitted to give that. Something to that effect. It's not if the union comes in, I won't give it to you because the union coming in. It's the question of how is it phrased. And how do you know? He's put into a quandary. If you give the raise and it's not regular and predictable, that's unilateral change and you get an unfair labor practice. If you're not able to discern and guess what the NLRB wants, then you've got an unfair labor practice for refusing. One more year 8A3, 8A5 argument. I get that. I'm just trying to get back to how to interpret that pre-election statement about if, I'm paraphrasing here, if the union comes in, we won't be able to have wage increases. Why isn't that sufficient? I mean, even the dissent thought that was sufficient. It didn't even persuade them. Because under the American Shipbuilding and under the Brown Foods, there has to be a hostile intent. And there is no hostile intent in those statements. It's a statement of what he believes he's able to do or not able to do. So even if a reasonable employee would have understood that as being hostile to the whether they should vote for the union, anti-union, that's not enough in your view under 8A1? I don't agree with that because I think that. You don't agree that it turns on how a reasonable employee would have interpreted it. Correct. Because if you look at the situation in this case, with the one pre-election statement, the employee said that they did not know if that's true or not, and they would look into it. And Woodcock said if you organize with a labor union, a lot of things that normally did day-to-day would have to be negotiated. And he specifically denied that statement. So the NLRB didn't take into account the entire circumstance. The second conversation in October or December of 2012, he said we're not allowed to bring it in. And what Woodcock said at the same time is what has been done in the past was discretionary and everything had to be negotiated. Everything had to be negotiated or I'd be in just as much trouble as I am for not doing it. When you look at the conversation as a whole, you look at that, a reasonable employee is not going to believe that they're doing it because of a union animus. They're doing it because he's not certain. And the board has to prove under the American Shipbuilding and Brown Food that there was a hostile intent. There was no hostile intent here. It's undisputed that ALS did not oppose the union organizing drive. They simply said if that's what you want to do, I'm not going to stop it. The other thing that I think is very important to look at is the issue of the Christmas gifts. The ALJ found and the board supported that the gifts came from Mr. and Mrs. Woodcock from their personal funds. It started as a project where the company gave a potluck and then as the company grew and became more successful, Mr. and Mrs. Woodcock, out of their personal funds, provided gifts. And what the NLRB looked at, ignored, was the fact that some of the gifts were cash, but many of them were physical items. They were trips. They were TVs. They were things like that. The company didn't keep records. The company didn't take income tax deductions. The Woodcocks didn't take deductions or keep records of it. I'm wondering if the IRS ever looked at this whole thing. The employees didn't pay taxes on it either, it sounds like. The employees didn't report it. It's in the record that they didn't report the gifts either. That's what I was thinking of. Sometimes a gift is a gift. And the NLRB went out of their way to do that. If we look at the charge and the complaint, the Woodcocks were never named in that, only ALS. And the board found that the respondent, meaning ALS, gave gifts. We showed ALS didn't. It's not supported by substantial evidence that ALS did. Plus, there was no allegation or no attempt to pierce the corporate veil, which was shown. And that's required by your case, the circuits in DuPois relying on the NLRB case on White Oak, which is cited in the briefs. Okay. We have your argument. We'll give you some time for rebuttal. Thank you, sir. And we'll hear from the board. Good morning. Good morning, Your Honor. David Seid for the Labor Board. At the outset, for a Section 881 violation, the test is whether there's a tendency to coerce. Here, the board, including the dissenting board member, did agree that there were two violations of Section 881. And, in fact, before this court, the companies only even contested one of them. That would be the 881 that occurred. If there were only 881 violations, what relief would be still in place? The remedy in that situation, Your Honor, would be for a notice posting and then for a cease and desist from engaging. I'm sorry. Can you repeat that? I didn't quite get what you just said. I'm just asking you to do it louder. Louder. Sorry, Your Honor. Louder. The remedy, if there was just a Section 881 violation, there would be a cease and desist order from engaging in that activity and any like-related activity, and also for a notice posting. And what, when you say like activity, how would you phrase that in this case? What are they supposed to refrain from doing? Right, Your Honor. It would be essentially the language that's already in the board's order, which would be to cease and desist from telling employees that they will not get raises if they choose or because they have chosen to be represented by a union, and then the equivalent part of the notice posting that would go along with that. They wouldn't get the back pay. That's correct. From just the 881. That's what I'm getting at. Thank you. If that's all there was. And on the, I'm going to ask about both the bonuses and the Christmas gifts, or I guess gifts is a loaded term here, but on the bonuses, what is the test, first of all, as you would say? Regular and predictable? Do you mean wage increases? I mean the wage increases, sorry. And, Your Honor, and I apologize. Are you referencing the Section 83 violation or the Section 85? Because the Section 83, again, the board has argued. Give me both. Well, before this court, for the Section 83, if an employer acts for unlawfully motivated reasons, there's a violation of Section 83, and it's set forth in the board's brief. The board is entitled. On the wage increases, though, what do they have to be in order for them to be required to be continued, I guess, is the way I'd phrase it. I'm using plain English, not board English here. In the context of the Section 83, as the board's majority opinion stated, their employees were told when they were hired that they would receive regular wage increases. They did receive regular wage increases, and there are board cases that are cited by the board that a Section 85 violation is not in any way dependent on finding that there's an independent Section 83 violation. And that was in the company's opening brief. It hasn't disputed that, and it has never taken issue in any of the cases cited by the board. I guess I don't understand how the wage increases were regular. And predictable. And predictable. That's what I was getting at. They have to be regular and predictable, correct? Your Honor, in the context of the Section 85 violation under CAPS, that would be correct. They would have to. But in the context of a Section 83 violation, as this Court recognized in the AFNI die case, which ended up getting remanded on the 85 violation, not the 83, and the Court in that case specifically recognized that there can be an 83 violation for unlawful motivation completely independent of whether or not there's a separate Section 85 violation. So explain to me how that works, because I'm stuck on that. How does that work? So even with an irregular wage increase, there can be an 83 violation in the facts of a case like this? Depending on the facts, yes. And in this case, while there might not have been on the facts of this case, again, the board didn't pass on the Section 85 violation. I understand. And I realize that the dissenting opinion didn't go into that. But there is evidence that it may not have been every five months or every seven months, and there might not have been an exact wage review, but there was evidence that employees did receive regular wage increases. But what if that's wrong? Can there still be an 83 violation? Well, Your Honor, part of that, it would be up to the company to have made that argument to this Court. It simply didn't. Put that aside. I know your point on that. That's an important one. But put that aside for the moment. If there were not regular wage increases, just assume that for a second. If there were not regular wage increases, could there be an 883 violation? There could be an 883 violation if the employer is acting out of unlawful motivation. If because the union has come onto the scene, it's doing something other than what it normally would have done because of the union, and there's evidence of unlawful motivation, there could be a Section 883 violation. So they're not continuing even the irregular wage increases because of the anti-union animus? Correct, Your Honor. They didn't explain it that way, though. So they just cut everything off because the union is there. That's correct, Your Honor. The evidence indicates employees were told when they were hired there would be periodic increases. They received periodic increases as the Board found. There's ample evidence that employees did receive periodic increases. The union comes along, the wage increases stop, the Christmas bonuses stop. Right. So on the wage increases still, if they thought they were irregular, they might have thought it was actually unlawful to continue the irregular wage increases, correct? Your Honor, they could have thought that, but the so-called no-win position, so to speak, is actually raised for the first time by the company in its reply brief at page 22. That's an argument that was made to this Court in its opening brief. The Board, in its decision at page 14 of the record, did talk about even if the employer had a reasonable belief, and it did go through several paragraphs as to why that reasonable belief on the fact that this case wasn't sufficient. It was incumbent for the employer, in its opening brief, to address the Board's decision. Okay. Put that aside again for a second. I take your point. I have your point on that. But suppose they – this is why the regular and predictable ultimately seems so key. If they weren't regular and predictable, then it would have been reasonable for the company to think we shouldn't continue these irregular wage increases because that might be unlawful, and therefore we're not going to continue the irregular wage increases. I understand the Court's concern. It was incumbent for the employer to have, first of all, introduced evidence at the hearing and let the administrative logic make a decision. Generally, first of all, just relying on attorney advice is not a defense to an unfair labor practice. I think the case law has well settled on that. But it was incumbent to build a record if that's what the defense is going to be. It's incumbent in response to the Board's decision. Didn't they argue that these were irregular? Yeah. I thought that's been a consistent argument throughout. As a general proposition, wage increases, I thought their argument was irregular. The Board's argument was, no, they were regular. And that's kind of the key. Well, to the extent they were arguing that it was irregular, but to the argument that the company is so-called in a no-win position, that's not something that is raised until the first time in its reply brief. Well, let's deal for a moment, though, with this question of regularity. Isn't that essential to the Board's case, that they be regular and predictable? The regular and predictable in the context of a Section 85, that it was totally appropriate for the Board in this case to find that employees were, even apart from, say, a cap situation, that the employees were receiving regular wage increases. Looking at the chart, almost all the employees, there might be a few that are at the outer ends that they might not have received a wage increase for a long time period. But most of the employees did receive at least one, if not more than one, wage increase during the course of the year. And there's no evidence that employees had ever gone over that as a whole. So the employer, I don't know why the no-win situation just isn't built into this problem, just by its very nature. And so what's the employer supposed to do if they say, all right, we're not, we are far from the cat's exception in this case. There's nothing automatic about these things. Things happen here and there, but there's nothing automatic or predictable about either the timing or the amount. Either one. Either one. Now, if the employer does anything, it won't be consistent with the past practice, and so that will be charged as an 8A3 violation, will it not? And so what are, the question is, what is the employer supposed to do? And what evidence did you have here of anti-union animus other than the fact that because of the union, and no cat's exception, I can't keep doing this? Your Honor, as far as animus comes from the two Section 8A1 violations that the Board found, only one of which is actually even contested before this Court. And so it comes obviously. Right, but one of them was even pre-election. Correct. One was pre-election and one was post-election. Okay. And the one pre-election, the employee was told, Mr. Woodcock told employee Schauer, that there would be no raise if they chose the union. And I would just point out that the company essentially has challenged that on credibility grounds and asserted that Schauer cannot recall the specifics of that conversation. His testimony actually at pages 35 and 36 was that, well, he couldn't recall all of the details. Couldn't recall anything of the conversation except that one line. But he definitely recalled that one line. That's correct. But that might have been correct if the wage increases were not regular and predictable before. I'm not disputing the 8A1 point. I'm just saying to carry over to the 8A3 on this point seems shaky if that was a correct statement of law. And whether it's a correct statement of law, I think, then turns on whether the wage increases had been regular and predictable. Yeah. Your Honor, there's no indication that President Woodcock was thinking of any of the legal implications as far as the raises being irregular in the company's view. And that was a statement that was made at that time. There wasn't a lot of evidence. Go ahead. There wasn't evidence the other way, really. And then the other statement, of course, was a statement that was made after the election when an employee asked about a raise that he was expecting to receive. And at that point, Mr. President Woodcock told the employee that he couldn't give a raise because of the whole union deal and that everything was frozen. That also is correct if it's, again, it all boils down to the regular and predictable again. Right. Because that's a correct statement. If they were irregular, then what he said at that point is correct. Well, an employer, again, an employer needs to continue to do whatever it's, whatever it was doing prior to the union coming on to the scene. And the Board's opinion does. . . Whoa, whoa, whoa, whoa, whoa, whoa, whoa, whoa. That presupposes regularity, what you just said. If there's no regularity to it, then they don't, they're not required to keep doing whatever they were doing before. Well, there can be some discretion, as this Court recognized in the Appy Dye case, where this Court recognized that regardless of whether the failure to increase wages was a Section 885 violation, if there was an unlawful motive, even if then the wage increases there were periodic wage increases, not necessarily given at exactly set time periods, the Court still found that there was a Section 883 violation, though on remand it eventually found that there was no, after the case came back to this Court after remand, ultimately found that there was no Section 885 violation. And, again, if the company's argument here, the Board addressed some of the Court's concerns at page 14 of the record. The company's opening brief doesn't, the company's brief doesn't address Arc Cagwest or Arc Bridges, where the Board explained how there can be an 883 absence of Section 885. It was, and I understand the Court's concerns, but it was incumbent for the employer to raise that before this Court in its opening brief. Okay. Can we talk about the Christmas? Yes. Bonuses. So they came from the personal funds, correct? That appears to be correct, Your Honor. So how can that be required to be continued when it wasn't something that the company was paying? It's just a common sense question I had reading this. Well, the employees were told, again, as with wages, employees were told when they would be hired that they would receive a Christmas payment. And if any employer, any employee, excuse me, thought, oh, boy, this is part of my wages, this is great, they presumably would have declared it on their taxes. And, Your Honor, as cited in the Board's brief, although not on this particular exact situation, the Board has recognized, and I believe, I'm not sure with this Court's approval, I apologize, that an IRS determination or how the IRS might treat something isn't determinative under the National Labor Relations Act. No, but it's how they understood it. So you said this is what the employees understood. If any employee understood this to be wages and were law-abiding, they would presumably have declared it on their taxes. Your Honor, the record indicates that at least a couple of employees did not report this for taxes. Whether they should have, again, that's an IRS issue. No, it goes to their understanding. The IRS, most taxes, as you know, are self-reported and everything depends on an honor system. A lot of what goes on in the tax system, not what the IRS does. And they understood this not to be triggering any tax obligation, presumably, because they understood that it was a gift. They also understood it, as the Board recently found, as essentially a term of employment that was being given yearly. This was substantial. It increased based on the years of service. The family is not a party to this litigation, nor to the administrative proceeding. The company is. If these funds were coming from the family, how is that compensation within the framework of this litigation? Your Honor, Mr. Woodcock was the primary owner of the company. I'm aware of that, but there's no bail-piercing exercise undertaken in the Board opinion, is there? No, there isn't, Your Honor. There's no alter ego analysis undertaken. And without one of those, how can you make the gifts from the family compensation from the company? I'm not saying they couldn't be done, but they haven't been done. Your Honor, I mean, if you had relied on this decision, which was adopted by the Board, actually did reference a case where an employer had tried to argue that it was coming from the individual owner and not the company, and that would be the HSM Machine Works case. And, again, it's not until the company has replied. I'm not suggesting that you couldn't have a bail-piercing or an alter ego theory. I'm just saying I don't see one. The Board does not seem to have undertaken one, and we're not supposed to affirm things on the basis that the Board hasn't. That's correct, Your Honor. But I would just note that the administrative law judges adopted by the Board had relied on a case, HSM Machine Works, where an employer had tried to rely on a gift being given by the owner and that it wasn't actually coming from the company. Did he say anything about in this case how it's established that this was coming from the company by bail-piercing, by alter ego theory, or by any other analysis? I mean, saying that it can be done and hasn't been done in another case does not say that it's been done in this case. Well, in that case, I just was trying to point out that it wasn't until the company's reply brief that he even addresses the case that was relied on by the Board, by the administrative law judges adopted by the Board. But whether or not the employees paid taxes here, the evidence is— But it's also—the evidence also indicates that the employees aren't necessarily separating this gift as coming from Mr. Woodcock as an individual versus that they're receiving a Christmas payment from the owner of the company. Even as to that, though, I think, I mean, it's not quite the cat's test. It doesn't have to be automatic. But it seems to me for it to be a reasonable expectation as part of wages, there has to be some stability as to what you are receiving. In some years, I guess it's a raffle ticket. So you might get something, you might get nothing, and there's a completely erratic amount. And so how, even as a remedial measure, is this to be enforced? I mean, the Board quite coyly said just restore the status quo. Well, I'm not sure he even knows what the status quo is to restore. Your Honor, for the three witnesses who testify, and I realize I'm over time, but I've got to remind you to walk through the testimony. You can keep going. Employee Ugotify, he started in 2011. So he gets told that any bonus for him would be unfair because he had just started. And that's at pages 26 and 24 of the decision and 49 and 53 of testimony in the appendix. Employee Gravel, he started in 2008. The evidence indicates that he went from $100 to $300 over a period of several years. I mean, this wasn't the most compelling case, right? So we have 2008, Gravel's the only one that got one in 2008. In 2009, all we have is that Gravel said he got something but doesn't remember what. 2010, no one got anything. In 2011, we've got is the only year you have all three of them getting something, and one of them is getting a gift card for $50 a coffee. Correct, Your Honor. And that was Employee Ugotify because he was a new employee. Right, but I'm just saying, is there anything remotely? I would worry as an employer if you don't have some predictability to hearing them. Maybe it's not as strict as the CAT standard for wage increases, but if there's not either a sufficient time period or sufficient predictability as to what they're getting, you're going to have the employer back in a heads-of-the-board-wins-tails-the-employer-loses situation because whatever they do, someone's going to say, that's not what I thought I was going to get. And so the very lack of predictability and consistency seems relevant to this issue to me as well. Why am I wrong? Two points. First, as far as the overall amount of money, President Woodcock acknowledged that he spent about $10,000 to $15,000 a year. So we have a general framework. And as far as the individual employees, there is a consistency. There was one year where Mr. Woodcock or President Woodcock approached the employees and whether they would be willing to give up their Christmas bonus because an employee's house had burned down. And so that's why one year nobody received it. I don't know how that helps you rather than hurts you. That seems entirely unemployment-related payment. And it all went to one person and no one else got anything. It sounds like he's just, you know, he has a heartfelt response to his employees at Christmas time. Because he went to the employees and the employees agreed not to have any Christmas bonus that year because they all agreed to help out this employee. No good deed goes unpunished, right? Well, that was something that the employees agreed to. And as far as consistency, again, there are the three employees, employees, shower. He started in 2009. Did he say he felt like he had to go to the employees or he just wanted to give a heads up why the Christmas party was going to be a bit different that year? The testimony, the finding by the board was that he went to the employees to ask them if it would be okay. Instead of giving them bonuses, it would be okay to give this to the one employee. And just very quickly, employee shower, he started in 2009. There was some confusion about the year that the money got donated to this one employee. But apart from that, his testimony was consistent in the context that he had initially gotten a $50 bonus that went up to $100. Gravel, he started in 2008. Wait, for shower I got, so he was employed in 2009. His testimony was impeached. So he didn't have anything for 2009. 2010 was no gift. And 2011 was $100. So all I got is the $100 gift for him. Am I missing something? No, his testimony was that one year he received $50, one year he received $100, and it was impeached. There was a lot of confusion as to which year the no bonuses were given to individual employees and it was given all to one employee. What do you think the lesson is for family-owned businesses who don't yet have a unionized workforce? The message is don't give them Christmas gifts, right? Well, Your Honor, again, the board would disagree with the characterization that this was simply a gift. This was not a hammer. Don't give them Christmas payments. This is not a hammer or a turkey. Don't give them anything. Don't give them anything. This was $10,000 or $15,000 being given year after year to about 50 employees, not insignificant. And that raises a question. What is the total amount of money that's at stake here? Do we have some sense of that? I was just curious as a practical matter. Your Honor, that would be a compliance issue as far as the gifts. I'm sorry, the court would characterize it as a gift, and obviously the board characterizes it as a Christmas payment. Sorry. The testimony from President Woodcock was $10,000 to $15,000. And how about on the other? As far as the pay increases, that would be a determination of compliance matter. We don't have a sense of that. It would be impossible for me as counsel here. That's fine. I was just curious if you had a sense. Okay. Thank you very much. Thank you, Your Honor. Thank you. We have a disparity in height on that. As I tell people frequently, I find myself to be short for my weight. I'm the perfect weight for 6'2". The cases that are cited in the brief are pretty clear in my mind. If the employer exercises discretion as to amount, timing, or who gets the wage increase, then it is discretionary. It is not fixed, and it is not predictable. When you look at the chart that was developed by the dissenting opinion of the board, it very clearly shows that the wage increases were not fixed, predictable, and timing. They varied over time. The question that you asked is, what is this about? How do you figure the amount in question is perhaps answered with a big question mark by the document that was produced by the compliance officer, Regent 19 of the NLRB. How do you figure it? He said, well, maybe what I do is I average the wages that each employee got, the increases got. Or maybe I instead will average the classifications wages. Or maybe I will average the total wages and give each person that. That flies in the face of being regular and predictable, and I find it very hard that the NLRB could sit here and in good conscience and straight face say that what happened here was regular, predictable wages, which is what indicates that. It's also interesting that they turn gifts from the Woodcocks, gifts that Mr. and Mrs. Woodcock paid out of their friends, and they change it from a gift to a bonus. I mean, that's a nice turning of the word, but these were gifts. That's all it was, and sometimes a gift is a gift. But even if you look at the language about Christmas gifts, the board said that the respondent granted Christmas payments to employees ranging from $50 to $500. And you look at the actual testimony. That of Shower says that you get a longevity bonus around Christmastime between $50 and up to $500. If you look at what he actually got, he was employed three years. He got one gift of $100, which would have been his third year. There is no evidence in the record to show any employee ever got a $500 gift or bonus. The other employee, Gavel, said you get a bonus in December. He didn't mention the frequency or the amount, and what he got is $100 in one year. He got $300 in another. The other, whose name I always have trouble pronouncing, Yutagafa, something to that effect, got a $50 coffee cart. And that's the evidence upon which the board found that the respondent gave away gifts, bonuses, of between $50 and $100. And if it has to be supported by substantial evidence, where is the substantial evidence in the record? Mr. and Mrs. Woodcock did not keep records of the gifts they gave, the TVs, the money, or things. I don't have records of the gifts that I've given to my children and grandkids over the years. I don't know what I did. I don't know the amount of money. They did the same thing. They can't be considered a part of the employment because it's not based upon that. It's based upon their goodwill. And how do you determine it? If they provided clothing, socks, TVs, trips, how do you determine that? The total amount is $10,000 to $15,000 of everything, not the dollars amount. And there's no substantial evidence to support that. I ask that you decline to enforce the board's order. Thank you for your time. Thank you to both counsel. The case is submitted.
judges: Kavanaugh, Millett, Sentelle